IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARILYN VANN, RONALD MOON, DONALD MOON, HATTIE CULLERS, CHARLENE WHITE and RALPH THREAT,<br><br>Plaintiffs,<br><br>v.<br><br>GALE A. NORTON, Secretary Of The United States Department Of The Interior, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | CASE NUMBER 1:03CV01711<br><br>JUDGE: Henry H. Kennedy<br><br>DECK TYPE: Civil Rights (non-employ)<br><br>DATE STAMP: 08/11/2003 |

**FILED**

**AUG 1 1 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## COMPLAINT

Plaintiffs, MARILYN VANN, RONALD MOON, DONALD MOON, HATTIE CULLERS, CHARLENE WHITE and RALPH THREAT, citizens of the Cherokee Nation of Oklahoma, as the direct descendants of individuals enrolled on Dawes Commission Rolls of the Cherokee Tribe, under the inclusive Freedmen category of the Dawes Commission Rolls (hereinafter referred to as "Freedmen"), by and through their undersigned counsel, for their complaint against GALE A. NORTON, Secretary of the United States Department of the Interior, and the UNITED STATES DEPARTMENT OF THE INTERIOR (the "Department" or "DOI"), an agency of which is the Bureau of Indian Affairs (the "BIA") allege as follows:

### PRELIMINARY STATEMENT

1. Plaintiffs, individual citizens of the Cherokee Nation of Oklahoma, bring this civil suit for declaratory and injunctive relief arising under the Constitution and laws of the United States to vindicate the rights of a long-oppressed and disadvantaged people. Plaintiffs bring this

action to redress long-standing and invidious racial discrimination against them by the BIA. This discrimination has excluded the Freedmen from their right to vote in the May 24, 2002 election and a subsequent run-off (together, the "Election") to determine the Chief and other elected officials of the Cherokee Nation as well as their right to vote in the Election on an amendment to the Cherokee Constitution to strike the clause, "No amendment or new Constitution shall become effective without the approval of the President of the United States or his authorized representative."

2. On or about August 6, 2003, the BIA, assisted by its local officials, reversed its position that the 1970 Principal Chiefs Act mandates that the Cherokee Nation of Oklahoma submit its election provisions to the Department of Interior prior to holding an election, and the BIA recognized the Election of Chad Smith as Chief of the Cherokee Nation of Oklahoma.

3. The BIA's decision to recognize the illegal Election (i) is in direct opposition to the Department's fiduciary duty to protect the Cherokee Nation from unlawful elections; the BIA has the responsibility and indeed, the duty to intervene and attempt to protect those rights through appropriate remedies, *Seminole Nation v. Norton*, No. Civ. A. 02-0730 (RBW), 2002 WL 31109804 (D.D.C. Sept. 23, 2002) ("*Seminole II*"), (ii) is in direct opposition to the 1970 Principal Chiefs Act (as defined below), (iii) is a reversal of its position stated in numerous letters to Cherokee Chief Chad Smith informing him of the requirement of submitting election procedures prior to holding the Election, and (iv) is in opposition to the BIA's position toward the Seminole Nation of Oklahoma regarding virtually the same matter.

4. With respect to the Seminoles, in connection with an election that prevented the Seminole Freedmen from voting, the BIA refused to recognize the illegally elected Seminole officials and refused to recognize any government-to-government relationship with that illegally

elected administration. The BIA successfully defended such position in this Court in *Seminole II*. In yet another case in this Court, the BIA successfully defended its position of not recognizing the Seminole Nation or the government-to-government relationship, where the Seminole Freedmen were voted out of the Seminole Nation by a Constitutional Amendment Referendum Election, <u>Seminole Nation of Oklahoma v. Norton</u>, No. 00-2384 (D.D.C. Sept. 27, 2001) (CKK) (*Seminole I*). The basis for the BIA's position, upheld by this Court, was that the Seminole Freedmen were ensured full citizenship rights under a Treaty entered into between the United States and the Seminole Nation of Oklahoma in 1866.

5. The United States and the Cherokee Tribe signed an 1866 Treaty with the same citizenship protections to the Cherokee Freedmen that were afforded the Seminole Freedmen in the Seminole Treaty of 1866. There is thus no principled distinction between this litigation and that involving the Seminoles. The BIA's determination to recognize the Cherokee Election that prevented the Cherokee Freedmen citizens from exercising their right to vote is a breach of the BIA's fiduciary duty.

## **PARTIES**

6. Plaintiffs Marilyn Vann, Ronald Moon, Donald Moon, Hattie Cullers, Charlene White and Ralph Threat are Freedmen of the Cherokee Nation. Each named Plaintiff can trace his or her ancestry to the Index and Final Rolls of Citizens and Freedmen of the Cherokee Tribe in Indian Territory approved by Act of Congress dated June 21, 1906 (34 Stat. 325) (the "Dawes Rolls") as compiled by the United States through the Dawes Commission, and is, accordingly, an enrolled member of the Cherokee Nation.

7. Defendant Gale A. Norton is the Secretary of the Defendant Department of the Interior ("Norton" or "Secretary") and the principal governmental official responsible for the

administration of Native American affairs and the operations of the BIA. Norton is an officer of the United States of America (the "United States"), which is the custodian and trustee of all Native American communal property.

8. Defendant United States Department of the Interior is and at all relevant times was an agency of the United States government. The DOI includes, among various agencies, the BIA and is responsible for the operations of the BIA.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1362. Jurisdiction to review agency action is invoked pursuant to the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 702-703. Declaratory relief is sought pursuant to 28 U.S.C. §§ 2201-2202.

10. This action arises under the Constitution and laws of the United States, including, but not limited to, the Fifth Amendment to the Constitution of the United States, the Treaty with the Cherokee Indians, July 19, 1866, 14 Stat. L., 799 (the "1866 Treaty"), Pub. L. No. 91-495, 84 Stat. 1091 (the "1970 Principal Chiefs Act"), the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301 et seq.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), as Defendant Norton and Defendant DOI reside in this District.

12. The United States has waived its and Defendant Norton's sovereign immunity to the claims herein by virtue of (without limitation), the APA and the United States' fiduciary and trustee obligations towards the Cherokee Nation and its citizens. Defendant Norton, in turn, has acted beyond her statutory authority by allowing her subordinate officers to violate the laws and the Constitution of the United States, as alleged herein, and thus has no sovereign immunity

under the doctrines established by Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908), Larsen v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S. Ct. 1457 (1949) and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999 (1971).

13. In this action Plaintiffs seek a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, setting forth their rights because of Defendants' violations of the Constitution and laws of the United States, and a declaration that the BIA cannot recognize the newly elected officials or the amended Cherokee Constitution, both put into place via the illegal Election, until such time as an election is held that recognizes and permits the Freedmen the right to vote in such election -- in other words, a declaration that the United States (including Defendants and the BIA), in its capacity as fiduciary and trustee, may not approve any election or other act by the Cherokee Nation in derogation of the rights of its Freedmen citizens. In addition, Plaintiffs seek a finding pursuant to the APA that Defendants' conduct has been arbitrary, capricious, an abuse of discretion, and not in accordance with law. Plaintiffs also request that a trustee be appointed to ensure that their civil rights are protected, as was done in the late 1800's.

## ALLEGATIONS COMMON TO ALL COUNTS

**Background**

14. In the 1830's Cherokees were forcibly removed from their lands in the south eastern United States and forced to migrate to Indian Territory, present day Oklahoma, in what has become known as the Trail of Tears. Among those persons in the Trail of Tears were slaves of Cherokees as well as free intermarried Blacks or children of mixed racial families.

15. In 1863, slavery was abolished and the Black Cherokees were emancipated by virtue of the 13th Amendment of the United States Constitution. In the same year the Cherokee

National Council also abolished slavery. Thereafter, all of the Black Cherokees became known as "Freedmen."

16.   In 1866, the Cherokees and the United States entered into the Treaty of July 19, 1866 (ratified July 27, 1866; proclaimed Aug. 11, 1866), 14 Stat. L. 799 (the "1866 Treaty") The 1866 Treaty contains the following provisions:

> ARTICLE 4.
>
> All the Cherokees and freed persons who were formerly slaves to any Cherokee, and all free negroes not having been such slaves, who resided in the Cherokee Nation prior to June first, eighteen hundred and sixty-one, who may within two years elect not to reside northeast of the Arkansas River and southeast of Grand River, shall have the right to settle in and occupy the Canadian district southwest of the Arkansas River, and also all that tract of country lying northwest of Grand River, and bounded on the southeast by Grand River and west by the Creek reservation to the northeast corner thereof; from thence west on the north line of the Creek reservation to the ninety-sixth degree of west longitude; and thence north on said line of longitude so far that a line due east to Grand River will include a quantity of land equal to one hundred and sixty acres for each person who may so elect to reside in the territory above-described in this article: *Provided*, That part of said district north of the Arkansas River shall not be set apart until it shall be found that the Canadian district is not sufficiently large to allow one hundred and sixty acres to each person desiring to obtain settlement under the provisions of this article.
>
> ARTICLE 5.
>
> The inhabitants electing to reside in the district described in the preceding article shall have the right to elect all their local officers and judges, and the number of delegates to which by their numbers they may be entitled in any general council to be established in the Indian Territory under the provisions of this treaty, as stated in Article XII, and to control all their local affairs, and to establish all necessary police regulations and rules for the administration of justice in said district, not inconsistent with the constitution of the Cherokee Nation or the laws of the United States; *Provided*, The Cherokees residing in said district shall enjoy all the rights and privileges of other Cherokees who may elect to settle in said district as hereinbefore provided, and shall hold the same rights

-6-

and privileges and be subject to the same liabilities as those who elect to settle in said district under the provisions of this treaty; *Provided also,* That if any such police regulations or rules be adopted which, in the opinion of the President, bear oppressively on any citizen of the nation, he may suspend the same. And all rules or regulations in said district, or in any other district of the nation, discriminating against the citizens of other districts, are prohibited, and shall be void.

ARTICLE 9.

The Cherokee Nation having, voluntarily, in February, eighteen hundred and sixty-three, by an act of the national council, forever abolished slavery, hereby covenant and agree that never hereafter shall either slavery or involuntary servitude exist in their nation otherwise than in the punishment of crime, whereof the party shall have been duly convicted, in accordance with laws applicable to all the members of said tribe alike. They further agree that all freedmen who have been liberated by voluntary act of their former owners or by law, as well as all free colored persons who were in the country at the commencement of the rebellion, and are now residents therein, or who may return within six months, and their descendants, shall have all the rights of native Cherokees: *Provided,* That owners of slaves so emancipated in the Cherokee Nation shall never receive any compensation or pay for the slaves so emancipated.

ARTICLE 10.

Every Cherokee and freed person resident in the Cherokee Nation shall have the right to sell any products of his farm, including his or her live stock, or any merchandise or manufactured products, and to ship and drive the same to market without restraint, paying any tax thereon which is now or may be levied by the United States on the quantity sold outside of the Indian Territory.

17.  In 1883, the Cherokee Tribal Council passed legislation that excluded the Freedmen and other tribal citizens without Cherokee blood, such as the Shawnees, Delawares and intermarried whites, from sharing in tribal assets.

18.  In 1888, the United States Congress responded with legislation that required the Tribe to share its assets equally with the Freedmen and other adopted citizens. (25 Stat. L. 608-

609.) To determine the number of eligible Freedmen and provide for their equitable treatment, Congress sent a federal agent to make a full record of all those who were entitled to share in the dispersal of federal funds within the Cherokee Nation.

19.     In 1889, 3,524 Freedmen were enrolled on a federal document called the Wallace Rolls to legitimate their claims to Cherokee Citizenship.

20.     In 1890, as the Cherokee Tribe continued to resist the Freedmen's equal right to Cherokee citizenry, the United States Congress authorized the federal Court of Claims to adjudicate the rights of the Cherokee Freedmen.

21.     *Moses Whitmire, Trustee for The Cherokee Freemen v. The Cherokee Nation and the United States*, 30 Ct. Cl. 138 (1895), held that the Freedmen were entitled to receive equal per capita payments of funds as equal citizens of the Cherokee Tribe. The Court of Claims held that while the tribal council could sell the common property, it could not discriminate against a particular class of citizens in deciding who was entitled to share in the proceeds. Ruling in favor of the Freedmen, the court awarded them $903,365 as their rightful share of $7,240,000. that had been generated from the sale of tribal lands.

22.     In 1893, the United States government established the Dawes Commission for the purpose of creating authoritative membership rolls for all of the Native American tribes in Oklahoma, including the Cherokee Nation. Although not required or authorized to do so, by 1898 the Dawes Commission began enrolling the Black Cherokee on a "Freedmen Roll"; other Cherokees were enrolled on a separate "Blood Roll." The effect of this gratuitous act of racial segregation in compiling the Dawes Rolls – imposed upon the Cherokee Nation by the Dawes Commission – was to divide the Cherokee Nation into "Freedmen" (those with some Black ancestry) and "Blood Indians." This division was illogical and inconsistent, too: a Cherokee who

was half Native American and half Black was designated a "Freedman"; one who was one quarter Native American and three quarters White was designated a Cherokee "by blood." No effort was made to record the percentage of Native American blood of those listed on the "Freedmen Roll," though historians agree that many of the Freedmen enrollees had mixed Native American ancestry. As a result, throughout the segregation years the Freedmen were subjected to Jim Crow laws and other forms of state-sanctioned discrimination.

23.     In 1898, Congress passed the Curtis Act, providing for allotment of communal tribal lands to all citizens of Cherokee Nation including Freedmen. The Curtis Act also extended jurisdiction over Indian Territory and abolished tribal courts.

24.     In *Daniel Red Bird v. United States*, 203 U.S. 76, 27 S. Ct. 29 (1906), the Supreme Court affirmed the citizenship and proprietary rights of the Freedmen as ensured by the 1866 Treaty as opposed to the intermarried whites that did not have such rights.

25.     In 1907, the Dawes Commission closed the final rolls of the Cherokee Tribe. The Dawes Commission created two separate rolls for the Cherokee Nation. Individuals possessing African blood as unscientifically determined by the Dawes Commission official would place the individual on the Cherokee Freedmen Roll. If an individual was half Black and half Cherokee Native American, he or she would be placed on the Freedmen Roll with no notation of Indian Blood, however, if the individual was ¾ White and ¼ Cherokee Native American, he or she would be placed on the Cherokee by Blood Roll with a notation of percentage of Indian Blood. The Dawes Commission stated that the Negroes were on equal footing with the full-bloods.

26.     BIA's Solicitor's Opinion, October 1, 1941, 1 Op. Sol. On Indian Affairs 1076 (U.S.D.I. 1979), addressed the question whether the Freedmen are entitled to vote on the

acceptance of a Constitution in pursuance of section 3 of the Oklahoma Indian Welfare Act. The opinion states, in relevant part:

> "As the membership rights of the Freedmen in the Five Civilized Tribes have been fixed by Treaties, which are the equivalent of statutes, and by formal tribal action in pursuance of these treaties, the Secretary would not appear to be authorized to issue regulations which would deprive the Freedmen of their right to vote on constitutions to be adopted by the Five Civilized Tribes under the Oklahoma Indian Welfare Act."

27. The 1970 Principal Chiefs Act, Pub. L. 91-495, 84 Stat. 1091, enacted by Congress, states that, notwithstanding any other provisions of law, the principal chiefs of the Cherokee, Choctaw, Creek, and Seminole Tribes of Oklahoma and the governor of the Chickasaw Tribe of Oklahoma shall be popularly selected by the respective tribes in accordance with procedures established by the respective tribes in accordance with procedures established by the officially recognized tribal spokesman and or governing entity. It further mandates that such established procedures shall be subject to approval by the Secretary of the Interior.

29. On June 26, 1976, Cherokee Freedmen voted in a Cherokee election on the adoption of a Cherokee Constitution ("1976 Constitution").

30. Article I of the 1976 Constitution states that the Cherokee Nation is an inseparable part of the Federal Union, and that the Constitution of the United States is the Supreme law of the land, and therefore, the Cherokee Nation shall never enact any law which is in conflict with any Federal law.

31. Article II of the 1976 Constitution states, in pertinent part, that the appropriate protections of the Civil Rights Act of 1964 shall apply to all members of the Cherokee Nation.

-10-

the Tribal constitution that would remove the requirement that future amendments be approved by the Secretary of the Interior."

38.  The BIA has made a final agency decision on the election for Principal Chief. The BIA decided to not require the compliance of the 1970 Principal Chiefs Act and require submission of voter regulations. The BIA was on notice that the Freedmen citizens were not entitled to vote in the election.

39.  The decision of the BIA to defer review of whether to acknowledge the Constitutional amendment is also a final decision, as the decision to recognize the Principal Chief in the same Election wherein the Freedmen were not permitted to vote indicates that Defendants do not find the stripping of voting rights as a basis for disavowing the Election results.

40.  Prior to the BIA's abrupt reversal of position, Plaintiffs, through their counsel, notified Defendants that the Freedmen were denied the right to vote in the May 24, 2003 Election and, as a matter of policy, the Freedmen had been stripped of their membership rights. (Copies of June 10, 2003 and July 21, 2003 letters from Plaintiffs' counsel, Jon Velie, are attached hereto as Exhibit 18.)

41.  Plaintiffs have exhausted their remedies before the BIA, and further, their pursuit of any such remedies would be futile in light of the well-documented and pervasive discrimination against them.

42.  Plaintiffs have no adequate remedy at law.

## AS AND FOR A FIRST CAUSE OF ACTION
(Violation of United States Constitution / Federal Law)

43.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 42 as though set forth fully herein.

44.     The BIA has breached its fiduciary duty to protect the voting rights of the Freedmen so that as citizens they can participate in the fundamental right to elect their leaders and determine whether their Constitution should be amended. Their rights to participate in this solemn process has been stripped on the basis of their race, with the knowledge that the Cherokee Nation will be ruled by officials that will be recognized by the United States although citizens were forbidden to vote. The recognition will result in millions of dollars of United States funds being dispersed to officials empowered by an unlawful election despite the demands and requests for the BIA's protection of the oppressed Freedmen citizens and elected officials of the Cherokee Nation.

45.     Defendants' acts violate, without limitation, the United States Constitution, the 1920 Principal Chiefs Act, the Cherokee Constitution, the Treaty Between the United States and the Cherokee Indians, March 21, 1866, 14 Stat. 755, and the Indian Civil Rights Act, 25 U.S.C. §§ 1301, *et seq*.

46.     By reason of the foregoing, a ripe and justiciable controversy exists, and Plaintiffs have standing to assert their rights.

47.     As a result of the foregoing, Plaintiffs are entitled to declaratory and injunctive relief to preserve their rights as members of the Cherokee Nation.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Judicial Review of Agency Action Under the APA)

48. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 - 47 as if set forth fully herein.

49. Defendants are responsible for protecting the interests of the Cherokee Nation, including the interests of the Freedmen.

50. By failing to require the filing of procedures prior to the Election, Defendants have breached their fiduciary duty.

51. By recognizing Chad Smith as Chief of the Cherokee Nation, as well as other officials elected to office in the illegal Election, Defendants have approved the racially discriminatory and unlawful disenfranchisement of the Freedmen.

52. By deferring consideration of the legality of the amendment of the Cherokee Constitution, Defendants have given it de facto approval, despite its having been effected illegally because of the unlawful preclusion of the Freedmens' voting rights.

53. By failing to follow the law as set forth in the *Seminole I* and *Seminole II* decisions, Defendants have failed to follow their own recognized laws and policies and have discriminated against the Cherokee Freedmen to their injury and prejudice.

54. Plaintiffs require and request a declaration, pursuant to 28 U.S.C. § 2201, that pursuant to 5 U.S.C. § 701 *et seq.*, the complained of actions of the Defendants are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

WHEREFORE, Plaintiffs respectfully pray for judgment granting declaratory and injunctive relief as follows:

55. Declaring that the United States government (including Defendants and the BIA), in its capacity as fiduciary and trustee, may not approve any election or other act by the Cherokee Nation in derogation of the rights of its Freedmen citizens.

56. Enjoining Defendants and the BIA from recognizing the Election results of the May 24, 2003 Election or the subsequent run-off until such time as a lawful election that includes all citizens of the Nation.

57. Directing the BIA to recognize the hold-over officials until such time a lawful election is held.

58. Directing the BIA to appoint a Trustee to ensure the civil rights of the Freedmen are not violated in the future.

59. Awarding Plaintiffs their reasonable attorneys fees, costs and disbursements from the parties, including but not limited to recovery of fees and costs from the United States pursuant to the Equal Access to Justice Act.