## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARILYN VANN, et al.,

                Plaintiffs,

                v.

DIRK KEMPTHORNE, et al.,

                Defendants.

Civil Action 03-01711  (HHK)

### MEMORANDUM OPINION AND ORDER

Marilyn Vann, Ronald Moon, Hattie Cullers, Charlene White, and Ralph Threat bring this action against the United States Department of the Interior and its Secretary ("DOI" or "Secretary"),[1] seeking declaratory and injunctive relief.  Plaintiffs allege that they are direct descendants of former slaves of the Cherokees, or free Blacks who intermarried with Cherokees, who were made citizens of the Cherokee Nation in the nineteenth century and are known as Cherokee Freedmen (the "Freedmen").  The Freedmen contend that the Cherokee Nation, with the approval of the Secretary, prevented them from participating in certain tribal elections in 2003 (the "2003 Elections") and seek a court order declaring the 2003 Elections invalid and enjoining the Secretary from recognizing the results of such elections until the Freedmen are permitted to participate in voting.  The Cherokee Nation has been granted limited intervention for the purpose of challenging this court's jurisdiction.

---

[1]  When this action was originally filed, Gail A. Norton, was Secretary of the United States Department of Interior and, appropriately, was named as a defendant.  Pursuant to Federal Rule of Civil Procedure 25(d), the present Interior Secretary has automatically been substituted as a party defendant in this action.

Before the court is the Cherokee Nation's motion to dismiss [#23] and the Freedmen's motion for leave to file a second amended complaint [#38] to add the Cherokee Nation and certain of its officials as defendants. Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that the Cherokee Nation is a necessary party that must be joined. Accordingly, the motion to amend the complaint is granted, and the motion to dismiss is denied.

## I. BACKGROUND

### A.    History of the Cherokee Freedmen

In the 1830s, the Cherokee Indians were removed from their lands in southeastern United States and were forced to migrate to Oklahoma along a route that became known as the Trail of Tears. Compl. ¶ 20.[2] Among those persons forced to migrate were the Black slaves of Cherokees, free Blacks who were married to Cherokees, and the children of mixed race families, known as the "Black Cherokees." *Id*. ¶¶ 20–21. Following emancipation, the Black Cherokees became known as the Freedmen and were made citizens of the Cherokee Nation by the Treaty of 1866 as a condition of the Nation's continued sovereignty within the United States. *Id*. ¶¶ 21–22.

### 1.    Treaty of 1866

The Treaty of 1866 provides that the Cherokee Nation "hereby covenant[s] and agree[s] that never hereafter shall either slavery or involuntary servitude exist in [the Cherokee Nation]" and that "all freedmen who have been liberated . . . as well as all free colored persons . . . and their descendants, shall have all the rights of native Cherokees." Treaty with the Cherokee, 1866,

_____

[2] All references to the "Complaint" herein refer to the Second Amended Complaint, which the court grants leave to file, as discussed more fully below. The Freedmen filed, and then withdrew, a motion to file a first amended complaint.

art. IX, July 19, 1866, 14 Stat. 799 ("Treaty of 1866").  The Freedmen are given the right to elect officials and to representation "according to numbers" on the national council.  *Id.* arts. V–VI. They are also given the right to sue in federal court if an action arose between a Freedman and another member of the Cherokee Nation.  *Id.* art. VII.  The Treaty of 1866 guarantees the Freedmen that laws "shall be uniform throughout said nation" and provides that if "any law, either in its provisions or in the manner of its enforcement, in the opinion of the President of the United States, operate unjustly in [the Freedmen] district, he is hereby authorized and empowered to correct such evil."  *Id.* art. VI.  Finally, the Treaty provides that "[n]o law shall be enacted inconsistent with the Constitution of the United States, or laws of Congress, or existing treaty stipulations with the United States."  *Id.* art. XII.

### 2.      Federal Protections for the Freedmen

Almost immediately after the emancipation of the Freedmen, the Cherokee Nation began marginalizing them.  In 1883, the Cherokee Tribal Council passed legislation excluding the Freedmen and other tribal citizens without Cherokee blood (such as a Shawnees, Delawares, and intermarried whites) from sharing in tribal assets.  Compl. ¶ 23.  In response, Congress enacted a law requiring the Cherokee Nation to share its assets with the Freedmen and other tribal members.  *See* An Act to secure to the Cherokee freedmen and others their proportion of certain proceeds of lands, Oct. 19, 1888, 25 Stat. 608.  In 1890, the Congress further authorized the U.S. Court of Claims to hear suits by the Freedmen against the Cherokee Nation for recovery of proceeds denied them.  *See* An act to refer to the U.S. Court of Claims certain claims of the Shawnee and Delaware Indians and the freedmen of the Cherokee Nation, Oct. 1, 1890, 26 Stat. 636.  A trustee was appointed to assist the Freedmen in securing their claims and, in 1895, the

3

Court of Claims held that the Freedmen were entitled to share in the tribe's proceeds and that the Cherokee Nation's sovereignty could not be exercised in a manner that breached the Nation's treaty obligations to the United States. *Whitmire, Trustee for the Cherokee Freedmen v. Cherokee Nation*, 30 Ct. Cl. 138, 180 (Ct. Cl. 1895).

In 1906, the Supreme Court confirmed that the Freedmen are citizens of the Cherokee Nation entitled to the same property rights as other members of the Nation under the Treaty of 1866. *Red Bird v. United States*, 203 U.S. 76, 84 (1906). A year later, the federally-appointed Dawes Commission finished compiling authoritative membership rolls for the so-called "Five Civilized Tribes" in Oklahoma. Compl. ¶¶ 28, 32. The Dawes Commission created two separate categories of Cherokee citizens: the "Freedmen Roll" for the Black Cherokee, and the "Blood Roll" for the other Cherokees. *Id.* ¶ 28. An individual possessing any African blood was placed on the Freedmen Roll, whereas an individual possessing any Indian blood was placed on the Blood Roll, as long as that individual did not possess any African blood. For example, an individual who was half Black and half Cherokee was placed on the Freedmen Roll, whereas an individual who was one-quarter Indian but three-quarters White was designated Cherokee by blood. No record of the quantum of Indian "blood" of the Freedmen was kept. *Id.* ¶ 32. Although the Dawes Commission created the separate rolls, it declared that those on the Freedmen Roll were on "equal footing" with those on the Blood Roll. *Id.*

In 1970, Congress passed the Principal Chiefs Act of 1970, which provides that the leaders of the Five Civilized Tribes must be popularly elected by members of their respective tribes in accordance with procedures established by those tribes (the "Act of 1970"). Pub. L.

91–495, 84 Stat. 1091.  Under the Act, "such established procedures shall be subject to approval by the Secretary of the Interior."  *Ibid.*

### 3.      1976 Cherokee Constitution

In 1976, the Cherokee Nation adopted a new constitution, in an election in which the Cherokee Freedmen were permitted to participate (the "1976 Constitution").  Compl. ¶ 35.  The 1976 Constitution provides that the U.S. Constitution is the supreme law of the land and that the Cherokee Nation will never enact a law that is in conflict with any federal law.  Cherokee Const. art. I.  The 1976 Constitution also provides that citizenship in the Cherokee Nation must be "proven by reference to the Dawes Commission Rolls."  *Id.* art. III § 1.  Regarding elections, Article IX limits election to the Tribal Council to members with Cherokee blood, but does not limit membership in the tribe or voting rights to Cherokees by blood.  *Id.* art. IX § 2.  The 1976 Constitution also provides that "[n]o amendment or new Constitution shall become effective without the approval of the President of the United States or his authorized representative."  *Id.* art. XV § 10.

### 4.      Code of the Cherokee Nation

At the time of the disputed 2003 Elections, the Code of the Cherokee Nation provided that "[t]ribal membership is derived only through proof of Cherokee blood based on the Final Rolls" of the Dawes Commission.  11 C.N.C.A. § 12; *see also Allen v. Cherokee Nation Tribal Council*, JAT 04–09, at 4,12 (Cherokee Nation Jud. App. Trib., Mar. 7, 2006) (explaining that

the Cherokee Nation asserts that the Freedmen are not "Cherokees by blood" and thus are not

"eligible for membership").[3]

**B.      Events Surrounding 2003 Elections**

At issue in this action are the 2003 Elections that took place on May 24, 2003, and July

26, 2003, to select a tribal chief and other members of the governing council, and to amend the

Cherokee Constitution to remove the requirement that all amendments be approved by the

Secretary, and the recognition by the Secretary and the Bureau of Indian Affairs ("BIA")[4] of the

results of those elections.  The events surrounding those elections, as alleged by the Freedmen,

are as follows:

**1.      Seeking Secretarial Approval**

In November 2001, Cherokee Chief Chadwick Smith wrote to the BIA, indicating the

tribe's intent to amend its 1976 Constitution to strike the provision requiring Secretarial approval

of constitutional amendments.  Neal McCaleb, assistant secretary of Indian Affairs, purportedly

---

[3] The status of this provision in the Cherokee Code is now in some doubt because the Cherokee Nation Judicial Appeals Tribunal has recently held that this provision contravenes the Cherokee Constitution, which does not require ancestry traced to membership on the "blood rolls" but rather membership on any Dawes Commission Roll.  *See Allen*, JAT 04–09, at 9–10. The Tribunal concluded that the only way to create a blood requirement for membership was by amending the Cherokee Constitution.  *Id.*

In response to that decision, the Nation's Tribal Council has proposed an amendment to the Constitution requiring "Indian blood" for citizenship in the Cherokee Nation, which is set to be voted on in February 2007.  *See Tribal Citizens to Vote on Citizenship Issue*, Cherokee Nation News Release, June 13, 2006, www.cherokee.org/home.aspx?section=story&id= qbH92fOQ7AE=.  At the time of the 2003 Elections, however, the provision precluding the Freedmen from voting was in effect, and the Freedmen allege it was used to prevent their participation in those elections.

[4] The Bureau of Indian Affairs is a division of DOI.

responded, indicating that the BIA did not oppose removing the provision requiring approval of

amendments, subject to certain conditions: (1) "[A]ll members of the Cherokee Nation, including

the Freedmen descendants who are otherwise qualified, must be provided an equal opportunity to

vote in the election;" (2) "[U]nder current law, no amendment of the Nation's Constitution can

eliminate the Freedmen from membership in the Nation absent Congressional authorization;" and

(3) "[N]otwithstanding any amendment of the Nation's Constitution, the Act of . . . 1970, until it

is repealed or amended, will still require Secretarial approval of the procedures for the election of

the leaders of the Cherokee Nation and the other of the Five Civilized Tribes."  Compl., Ex 2 at

1–2 (Ltr. of Mar. 15, 2002).

By a letter dated April 23, 2002, however, McCaleb wrote to Chief Smith regarding the

March 15 letter "purportedly signed by me."  *Id.*, Ex. 3 at 1 (Ltr. of Apr. 23, 2002).  McCaleb

explained that, "I did not sign the March 15 letter and did not authorize the use of the autopen to

engross my signature on the letter.  The letter is of no validity or effect and should be

disregarded."  *Id.*  The letter went on to say that the BIA had "no objection to the referendum as

proposed" and that McCaleb was "prepared to approve the amendment deleting the requirement

for Federal approval of future amendments."  *Id.* at 2.  Finally, the letter reiterated that the

requirements of the Act of 1970 (requiring that election procedures be approved by the Secretary)

was still in effect.  No explanation was given for the contradictory correspondence.

### 2.    Results of 2003 Elections

On May 24, 2003, an election was held by the Cherokee Nation reelecting Chadwick

Smith as the Principal Chief, as well as several other tribal officials.  The voters also approved an

amendment to the Cherokee Constitution which eliminated the provision requiring Secretarial

approval for future amendments to the Constitution.  Another election was held on July 26, 2003,

which included a run-off for certain offices and further Amendments to the Cherokee

Constitution.[5]  The Freedmen allege that they were not permitted to participate in either of these

elections.

Following the May election, the Freedmen complained to the Secretary that the Cherokee

Nation was denying membership "as a matter of policy for Cherokees who can trace only to the

Cherokee Freedmen Rolls," as opposed to the so-called "Blood Rolls" compiled by the Dawes

Commission.  *Id.*, Ex. 19 at 1 (Ltr. of June 10, 2003).  The Freedmen further complained that

they were not permitted to vote in the May 24, 2003 election, which the Freedmen contended

rendered that election invalid under the Treaty of 1866 as well as federal law.  *Ibid.*  Accordingly,

the Freedmen requested that the Secretary declare the election invalid and require a new election

in which Freedmen would be permitted to vote.

By correspondence dated July 11, 2003, the Secretary requested the Cherokee Nation to

submit its election procedures as required under the Act of 1870 and to respond to the concerns

of the Freedmen.  Chief Smith replied to the Secretary: "For over a quarter of a century, the

Department has never to our knowledge required nor suggested that [the] Cherokee Nation

submit its internal election procedures for Departmental approval."  *Id.*, Ex. 10 at 3 (Ltr. of July

---

[5]  There is no evidence in the record submitted to this court of the contents of the July 26, 2003 constitutional amendments.  The Cherokee Nation asserts in its motion that none of the amendments adopted at either election "altered Cherokee Nation citizenship or voting rights." Intervenor's Mot. to Dismiss at 3 n.2.  It should be noted, however, that the position of the Cherokee Nation is that its Constitution had always restricted citizenship to those who could prove descendancy from members with Indian blood.  *See Allen*, JAT 04–09, at 12 (explaining that the Cherokee Nation contends that the Freedmen are not "Cherokees by blood" and thus "are not eligible for membership" under the constitution).

14, 2003).  Thereafter, the Cherokee Nation's counsel wrote to the Secretary to further explain that the proposed amendment to the 1976 Constitution would not alter the Nation's "existing constitutional citizenship requirements," which are based on enrollment in the "Dawes Commission Rolls."  *Id.*, Ex. 14 at 1–2 (Ltr. of July 18, 2003).  The letter emphasized that no provision of the 1976 Constitution, nor any aspect of the proposed amendments, addressed voter qualifications.  *Id.* at 3.  The letter explained that the proposed amendments "do not purport to disenfranchise any citizen in any manner whatsoever," and further asserted that the Freedmen's complaints were properly aired in the courts of the Cherokee Nation.  *Id.*

By a letter dated July 21, 2003, the Freedmen complained to the Secretary again, contending that the Cherokee Nation's failure to submit its election procedures for Secretarial approval was a violation of the Treaty of 1866.  *Id.*, Ex. 20 at 1 (Ltr. of July 21, 2003).  The Freedmen contended it was a violation of the Secretary's "fiduciary duty" as trustee of the Cherokee Nation to permit elections which were premised on disenfranchisement.  *Id.* at 2.  Moreover, the Freedmen contended that the Secretary was acting contrary to its own policy regarding the Seminoles:  The Secretary had refused to recognize Seminole leaders selected in an election in which the Seminole Freedmen were not permitted to vote.  *See Seminole Nation of Okla. v. Norton,* 223 F. Supp. 122, 134 (D.D.C. 2002) (holding that the Secretary was "obliged" to refuse recognition of leaders in violation of treaties and the Seminole constitution).

Subsequently, by a letter dated July 25, 2003, the Secretary again wrote to the Nation, reiterating that the Act of 1970 required approval of election procedures and notifying the Nation that the Department was "aware of no evidence that the Secretary has approved the current

procedures for the election of the Principal Chief." Compl., Ex. 16 at 1 (Ltr. of July 25, 2003).

The Secretary also repeated the request that the Nation respond to the concerns of the Freedmen.[6]

### 3.    Secretarial Recognition of Cherokee Leaders

By a letter dated August 6, 2003, the Secretary notified the Cherokee Nation that the

election of Chief Smith had been officially recognized and observed that it was "inappropriate

and premature for the Department [of the Interior] to question the validity of the election of

Tribal officials." *Id.*, Ex. 18 at 2 (Ltr. of Aug. 6, 2003). The Secretary explained that any dispute

over Chief Smith's election should be resolved by tribal courts, pursuant to *Wheeler v. U.S. Dep't

of Interior*, 811 F.2d 549 (10th Cir. 1987) (holding that intra-tribal disputes over election results

should be resolved in the first instance by Cherokee tribal courts). The letter further explained

that the Secretary was continuing to review the May 24, 2003, amendment to the Nation's

constitution removing the requirement that amendments be approved by the Secretary, but had

not yet approved it.

In June 2006, Cherokee Chief Smith notified the Secretary that the Nation was

withdrawing its request for approval of the constitutional amendment passed on May 24, 2003,

indicating that approval was a "moot issue" pursuant to a ruling of the Cherokee Nation Supreme

Court, JAT 05-04. Compl., Ex. 21 at 1 (Ltr. of June 9, 2006).[7]

---

[6] On August 5, 2003, two members of the Cherokee Tribal Council sent a letter to the BIA to complain that the Freedmen were not permitted to vote in the election, whereas the Shawnee and Delaware members of the Cherokee Nation were permitted to vote. The council members (who are not plaintiffs in this action) requested that the Secretary recognize the hold-over officials, appoint a trustee to represent the Freedmen, and refuse recognition of the election and the new amendment to the Nation's constitution.

[7] The ruling of the Cherokee Nation tribunal was not submitted to this court.

10

**C.      Present Action**

In this suit, the Freedmen allege violations of their rights under the Thirteenth Amendment, the Fifteenth Amendment, the Cherokee Constitution, the Act of 1970, the Treaty of 1866 and the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301 *et seq.* ("ICRA").  They seek review under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.,* contending that the Secretary has "breached [his] fiduciary duty to protect the voting rights of the Freedmen" by failing to require the Cherokee Nation to file its election procedures and by recognizing the new leaders, which would result in "millions of dollars of United States funds being dispersed to officials empowered by an unlawful election."  Compl. ¶ 55.  The Freedmen also seek a declaratory judgment that the 2003 Elections are invalid, and an order enjoining the Secretary and from recognizing the results of such elections until the Freedmen are permitted to participate.

## II. ANALYSIS

Before the court is the Cherokee Nation's motion to dismiss,[8] as well as the Freedmen's motion for leave to file a second amended complaint, seeking to add the tribe and its individual officials.  The Cherokee Nation contends the suit must be dismissed because the Nation is a necessary and indispensable party that cannot be joined because it is immune from suit in federal court, or, alternatively, that the suit should be dismissed for lack of final agency action.  The Nation also contends that the motion to amend should be denied because the Freedmen have failed to exhaust their tribal remedies, and because they have failed to state a claim against the individual defendants.  The parties' contentions will be considered in turn.

---

[8] The Secretary has filed an answer to the complaint but has not filed a motion to dismiss. He indicates in a "response" to the Cherokee Nation's motion that he does not oppose the motion to dismiss.

**A. Failure to Join a Necessary Party**

The Cherokee Nation contends that it is both a necessary and indispensable party to this action, but that it cannot be joined due to its sovereign immunity.  Consequently, the Cherokee Nation argues, this action must be dismissed pursuant to Federal Rule of Civil Procedure 19.  In assessing a motion to dismiss for failure to join an indispensable party, the court must perform a two-step analysis.  *Davis v. United States*, 343 F.3d 1282, 1288 (10th Cir. 2003).  First, the court must determine whether the absent party is "necessary" to the action.  Fed. R. Civ. P. 19(a).  A necessary party must be joined if feasible.  *Id.*  Second, if that party cannot be joined, then the court must determine whether the party is "indispensable" — that is, whether "whether in equity and good conscience" the action may nonetheless proceed without the necessary party, or whether the case should be dismissed for failure to join.  Fed. R. Civ. P. 19(b); *Davis*, 343 F.3d at 1289.

**1.       Necessary Party**

A party is "necessary" to an action if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed. R. Civ. P. 19(a).

 In these circumstances, the Cherokee Nation is a necessary party.  The Nation has an interest in administering its sovereign electoral and constitutional affairs.  *See Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991) (concluding that "the

Quinault Nation undoubtedly has a legal interest in the litigation.  Plaintiffs seek a complete rejection of the Quinault Nation's current status as the exclusive governing authority of the reservation").

The Freedmen's contention that the relief they seek will not significantly affect the governmental affairs of the Cherokee Nation because Chadwick Smith was the chief prior to the 2003 Elections cannot be sustained.  There were several other candidates elected in the 2003 Elections, and there is no evidence indicating how they would be effected by rescinding the election.  More importantly, the sovereign interests of a tribe clearly are affected when the validity of a tribe's elections are questioned.  Thus, the Cherokee Nation is a necessary party that must be joined if feasible.  Fed. R. Civ. P. 19(a).

### 2.  Feasibility of Joinder

 Having determined that the Cherokee Nation is a necessary party, the court next addresses whether joinder is feasible.  Relying on the sovereign immunity doctrine, the Cherokee Nation asserts that joinder is not feasible because it is immune from suit in federal court.

Under the doctrine of sovereign immunity, American Indian tribes are protected from suit unless Congress has abrogated that immunity or the tribe has voluntarily waived it.  *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.,* 523 U.S. 751, 756 (1998); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 (1978).  Abrogation of a tribe's immunity will only be found where Congress has "unequivocally" indicated its intent to do so.  *C&L Enters. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001).  When properly asserted, sovereign immunity is jurisdictional and deprives the court of the power to decide the matter.  *Fletcher v. United States*, 116 F.3d 1315, 1326 (10th Cir. 1997).

The Freedmen assert that the Thirteenth Amendment's prohibition of "badges and incidents of slavery," along with the Treaty of 1866, abrogates the tribe's immunity.  Pls.' Opp'n to Intervenor's Mot. to Dismiss, at 16.  As explained below, the court agrees.

Although American Indian nations retain some of the sovereignty they enjoyed prior to the founding of the United States, that sovereignty is "subject to the superior and plenary control of Congress."  *Santa Clara Pueblo*, 436 U.S. at 58.  The tribes' "incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised.  By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others."  *United States v. Wheeler,* 435 U.S. 313, 323 (1978); *see also United States v. Kagama*, 118 U.S. 375, 381 (1886) (recognizing that Indian nations are "regarded as having a semi-independent position . . . not as States, not as nations, not as possessed of the full attributes of sovereignty").  Accordingly, Congress has "plenary" authority to abrogate tribal immunity.

One of the federal laws that operates to abrogate the Cherokee Nation's immunity is the Thirteenth Amendment.  Section 1 of the Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction."  Section 2 further provides that "Congress shall have power to enforce this article by appropriate legislation."  The Thirteenth Amendment "is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States."  *Civil Rights Cases*, 109 U.S. 3, 20 (1883).  As such, the Thirteenth Amendment's eradication of slavery and "badges and incidents

14

of slavery" has been held to reach non-state actors and private individuals. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 438–39 (1968) (holding that Congress could ban discrimination by individuals in real estate sales under the Thirteenth Amendment); *Runyon v. McCrary*, 427 U.S. 160, 175 (1976) (holding that Congress could ban discrimination in private contracting pursuant to the Thirteenth Amendment).  And there is no dispute that the broad sweep of the Thirteenth Amendment applies to Indian tribes as well. *United States v. Choctaw Nation*, 193 U.S. 115, 124 (1904) (recognizing that the Emancipation Proclamation and Thirteenth Amendment freed the slaves of tribal nations); *In re Sah Quah*, 31 F. 327, 330 (D. Alaska 1886) (ordering release of Indian held in slavery by another Indian based on the Thirteenth Amendment).[9]  As the leading scholar on Indian law has observed, the "principle sought to be attained by the [Thirteenth Amendment] makes any other interpretation inconceivable."  Cohen, at 918.

The Thirteenth Amendment was purposefully constructed to authorize Congress "to legislate not merely against slavery itself, but against all the badges and relics of a slave system." Akhil Reed Amar, *America's Constitution* 362 (2006) (internal quotation marks omitted).  The Thirteenth Amendment was ratified on December 18, 1865. *Jones,* 392 U.S. at 431.  Less than a month later, on January 5, 1866, Congress introduced its first major enforcement legislation under Section 2 — the Civil Rights Act of 1866 — which it then passed (over a presidential veto) on April 9, 1866. *Id.* at 435.  The Civil Rights Act of 1866 sought to guarantee the rights

---

[9]  Although American Indian nations are generally not constrained by most of the limitations of the U.S. Constitution, which only apply to federal or state governments, *see Talton v. Mayes*, 163 U.S. 376, 382 (1896); Felix S. Cohen, *Handbook of Federal Indian Law* 916 (2005 ed.) (hereinafter Cohen) ("Indian tribes are not states of the Union within the meaning of the Constitution, and the constitutional limitations on states thus do not apply to tribes."), the Thirteenth Amendment applies to private actors as well, including Indian tribes.

of the newly emancipated to "acquire property, the right to go and come at pleasure, the right to

enforce rights in the courts, to make contracts, and to inherit and dispose of property." *Id.* at 432

(internal quotation marks omitted).  At the time it was debated, Congress "had before it an

imposing body of evidence pointing to the mistreatment of Negroes by private individuals and

unofficial groups." *Id.* at 437 (citations and internal quotation marks omitted).  As the Supreme

Court observed, by enacting

> the Civil Rights Bill of 1866, passed in view of the Thirteenth Amendment, before
> the Fourteenth was adopted, [Congress] undertook to wipe out these burdens and
> disabilities, the necessary incidents of slavery, constituting its substance and
> visible form; and to secure to all citizens of every race and color, and without
> regard to previous servitude, those fundamental rights which are the essence of
> civil freedom, namely, the same right to make and enforce contracts, to sue, be
> parties, give evidence, and to inherit, purchase, lease, sell and convey propertty, as
> is enjoyed by white citizens.

*Civil Rights Cases*, 109 U.S. 3, 22 (1883).

The Supreme Court concluded from these circumstances surrounding the enactment of

the Civil Rights Act of 1866 that it was intended to enforce the Thirteenth Amendment against

all under the jurisdiction of the United States, including private parties. *Jones*, 392 U.S. at 439.

Furthermore, the Court concluded that private discrimination in real estate sales could be

prohibited under 42 U.S.C. § 1982 (the modern-day codification of the Civil Rights Act of 1866)

because the inability to buy and sell property was a "badge incident to slavery." *Id.*  To support

its determination of Congress's broad reach under the Thirteenth Amendment, the *Jones* Court

observed that the "Congress which assembled in the Nation's capital in December 1865" was of

the view that the legislation it was debating would reach *all* discriminatory conduct, not just that

by government actors. *Id.* at 428.

16

It was this same Congress that, in July 1866, ratified the Treaty of 1866 which granted the Freedmen "all the rights of native Cherokees," art. IX, guaranteed the Freedmen that laws "shall be uniform throughout said nation," art. VI, and provided that "[n]o law shall be enacted inconsistent with the Constitution of the United States, or laws of Congress, or existing treaty stipulations with the United States," art. XII.  The Treaty of 1866 not only incorporated the principles of the Thirteenth Amendment and the Civil Rights Act of 1866 , but it made such principles a *condition* of the Cherokee Nation's existence within the United States.

Congress's unequivocal intent to limit the Nation's sovereignty as a condition of recognition by the United States becomes all the more clear when considered in the context of history.  During the Civil War, the Cherokee Nation had signed a treaty of alliance with the Confederacy which it only repudiated when its chief was captured by Union forces.  Circe Sturm, *Blood Politics, Racial Classification and Cherokee National Identity: The Trials and Tribulations of the Cherokee Freedmen*, in *Confounding the Color Line: The Indian-Black Experience in North America* 223, 225–26 (James F. Brooks ed., 2002).  At the time of the war, the Cherokees held a greater number of slaves than any other tribe in Indian Territory, and the majority of Cherokees were sympathetic to the Confederacy.  *Id.*  At the end of the war, however, when the Union forces were triumphant, "the Cherokee country was virtually conquered territory, and the Cherokee Nation at the mercy of the United States."  *See Whitmore, Trustee for the Cherokee Freedmen v. Cherokee Nation*, 30 Ct. Cl. 138, 150 (Ct. Cl 1895).  The Cherokee Nation was regarded as having "forfeited" its previous treaty rights in relation to the United States "for its espousal of the cause of the Confederacy," but the United States was "willing to renew relations with them, stipulating, among other things, that the institution of slavery, which

17

has existed among several of the tribes, must be forthwith abolished, and measures taken for the

unconditional emancipation of all persons held in bondage, and for their incorporation into the

tribes on an equal footing with the original members, or suitably provided for." *United States ex

rel. Lowe v. Fisher*, 223 U.S. 95, 98 (1912) (internal quotation marks omitted); *see also

Whitmire*, 30 Ct. Cl. at 150 (relating that United States "insisted" upon certain limitations to the

sovereignty of the Cherokee Nation as "a condition to peace and the continued existence of the

nation as a government").  Similar treaties were signed with all of the Five Civilized Tribes in

1866.  *Seminole Nation v. United States*, 90 Ct. Cl. 151, 152 (Ct. Cl. 1940) (recounting how

federal government officials informed tribal leaders of one of the conditions of their semi-

independent status within the United States: "Slavery to be abolished, and measures to be taken

to incorporate the slaves into the tribes, with their rights guaranteed.").[10]  As one federal court

later observed, "[a]n examination of the treaties made immediately after the close of the Civil

War with the tribes who had entered into treaties with the Confederacy, unmistakably discloses

that the predominant purpose and intent of the Government as to preexisting slavery was to

protect and care for the freedmen." *Seminole Nation v. United States*, 78 Ct. Cl. 455, 466 (Ct.

Cl. 1933) (holding that Seminole Freedmen were entitled to full membership in the tribe based

on the Treaty with the Seminole of 1866); Cohen, at 918 (citing Treaties of 1866 with Five

Civilized Tribes as "contemporaneous evidence" that the Thirteenth Amendment applied to

Indian tribes).  The Cherokee Nation remained intransigent, however, with respect to fulfilling its

obligations to its Freedmen citizens, so Congress passed an act requiring the Cherokee Nation to

---

[10]  *See* Treaty with the Seminoles, 14 Stat. 755 (1866); Treaty with the Choctaws & Chickasaws, 14 Stat. 769 (1866); Treaty with the Creeks, 14 Stat. 785 (1866).

share its assets with the Freedmen and other tribal members. *See* An Act to secure to the Cherokee freedmen and others their proportion of certain proceeds of lands, October 19, 1888, 25 Stat. 608.

By repeatedly imposing such limitations on the sovereignty of the Cherokee Nation in order to protect the Freedmen, Congress has unequivocally indicated its intent to abrogate the tribe's immunity with regard to racial oppression prohibited by the Thirteenth Amendment. Although the right to vote is not explicitly mentioned by the Thirteenth Amendment, there can be no doubt that the right to vote is fundamental and cannot be denied on account of race. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). And there is no denying that the right to vote was repeatedly denied to former slaves and their descendants in the decades following emancipation, through the use of poll taxes, literacy tests, and outright intimidation. *South Carolina v. Katzenbach*, 383 U.S. 301, 311 & n.9 (1966) (describing tactics employed in the post-Reconstruction era to "take from (the 'ignorant blacks') every ballot that we can," including literacy tests, grandfather clauses for poor whites, property qualifications, and character tests (quoting Senator Ben Tillman (S.C.))). Thus, the denial of the right to vote based on one's race is nothing if not a "badge and incident of slavery." *See* Lydia Edwards, Comment, *Protecting Black Tribal Members: Is the Thirteenth Amendment the Linchpin to Securing Equal Rights Within Indian Country?*, 8 Berkeley J. Afr.-Am. L. & Pol'y 122, 146 ("Although voting is not a right under the Thirteenth Amendment, it is a civil right that cannot be denied on account of race. Because denial of civil rights that are enjoyed by other citizens on account of race is a badge and incident of slavery, it follows that denial of the right to vote in this case is also a badge and incident of slavery.").

That the Freedmen are not protected by the Fourteenth or Fifteenth Amendment, under which voting rights are usually enforced, further emphasizes that they must be protected by the Thirteenth Amendment and the Treaty of 1866.  To conclude otherwise would be to deny effect to the Thirteenth Amendment as well as Congress's repeated enactments to protect the Freedmen's rights to full membership in the Cherokee Nation, which includes the fundamental right to vote.  Thus, the court concludes that the Cherokee Nation is not protected by sovereign immunity from the Freedmen's claims arising under the Thirteenth Amendment and the Treaty of 1866.  Consequently, for the claims raised here, sovereign immunity is no bar to joining the Nation in this action.

The court recognizes that there are numerous decisions dismissing suits against Indian tribes on the grounds that the tribe could not be joined due to sovereign immunity.  *See, e.g., Wichita and Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 777–78 (D.C. Cir. 1986) (affirming dismissal for failure to join indispensable third-party tribes who were immune from suit).  Indeed, several courts have rejected claims similar to those advanced by the Freedmen here on the grounds of sovereign immunity.  *See, e.g., Davis*, 343 F.3d at 1294 (affirming dismissal of suit by Freedmen of the Secretary where Seminole Nation could not be joined due to sovereign immunity); *Nero v. Cherokee Nation of Oklahoma*, 892 F.2d 1457, 1461 (10th Cir. 1989) (holding that Treaty of 1866 did not constitute a waiver by the Cherokee Nation of its sovereign immunity in suit by Freedmen to ensure their voting rights).  What these courts apparently failed to consider, however, is that Congress clearly indicated its intent to abrogate the Cherokee

Nation's immunity with respect to violations of the Thirteenth Amendment as evidenced by the Treaty of 1866.[11]

## B.    Final Agency Action

Alternatively, the Cherokee Nation contends that this action must be dismissed because the Secretary has not yet taken a final agency action.  Under the APA, a federal court's authority to review an agency's conduct is limited to cases challenging a "final agency action."  5 U.S.C. § 704.  To be final, an action need not be "the last administrative [action] contemplated by the statutory scheme."  *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 589 n.8 (D.C. Cir. 1971).  Rather, an agency action is final where "rights or obligations have been determined," or

---

[11]   The court is not persuaded by the Freedmen's contentions that the Nation's immunity was abrogated by ICRA and the Curtis Act, 30 Stat. 495 (1898).  Under ICRA, Congress only abrogated the immunity of American Indian nations to the extent of authorizing habeas corpus claims against tribal authorities.  *Santa Clara Pueblo*, 436 U.S. at 59 (concluding that ICRA did not authorize tribe member to sue her tribe in federal court for alleged violations of her civil rights).  The Curtis Act was repealed by the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. § 461.  *See Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1446 (D.C. Cir. 1988); Cohen, at 303.

Nor does the court agree with the Freedmen's assertion that the Cherokee Nation waived its immunity by intervening in this action, as the Cherokee Nation sought, and was granted, leave for limited intervention for the purpose of moving to dismiss which does not constitute a waiver of immunity.  *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 327 F. Supp. 2d 995, 1000 (W.D. Wis. 2004) (observing that a sovereign entity "may intervene for a limited purpose such as moving to dismiss the lawsuit for failure to join an indispensable party without waiving their sovereign immunity"); *Wichita and Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 773–74 (D.C. Cir. 1986) (recognizing that a tribe asserted tribal immunity and thus did not "voluntarily" become a party to a cross-claim).

Finally, the court need not reach the Freedmen's argument that the Treaty of 1866 constitutes a waiver by the tribe of its own immunity, as the court has already determined that the Thirteenth Amendment and the Treaty were evidence of Congress's intent to abrogate the tribe's immunity.

from which "legal consequences will flow." *Barrick Goldstrike Mines, Inc., v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (internal quotation marks omitted).

Here, the Secretary's decision to recognize the leaders elected in the 2003 Elections constitutes a final agency action. *See Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 142 (D.D.C. 2002).   Under federal statutes and treaties, the Secretary has a fiduciary duty to ensure that tribal leaders are truly representative of the members they purport to represent in relations with the United States government. *See Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) ("Payment of funds at the request of a tribal council which, to the knowledge of the Government officers charged with the administration of Indian affairs and the disbursement of funds to satisfy treaty obligations, was composed of representatives faithless to their own people and without integrity would be a clear breach of the Government's fiduciary obligation."). When faced with a similar scenario of disenfranchisement by the Seminoles of their Freedmen citizens, the Secretary refused to recognize a government elected without the participation of the Freedmen. *See Seminole Nation*, 223 F. Supp. 2d at 125–26.   The Seminole Nation filed suit, seeking review of the Secretary's decision.   The court determined that the letter explaining the reasons for the Secretary's refusal to recognize the new government constituted a final agency action in that it was " 'a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation.' " *Id.* at 142 (citing *Barrick*, 215 F.3d at 48).[12]

---

[12]   As the court observed, the Secretary " 'is charged not only with the duty to protect the rights of the tribe, but also the rights of individual members.   And the duty to protect these rights is the same whether the infringement is by non-members or members of the tribe.' " *Seminole Nation*, 223 F. Supp. 2d at 137 (quoting *Milam v. U.S. Dep't of the Interior*, 10 ILR 3013, 3015 (D.D.C. Dec. 23, 1982)). The court ultimately concluded that the Secretary was obliged to withhold its recognition of tribal representatives who were elected in violation of the Seminole Constitution because the Nation was taking "oppressive action . . . against its own minority

Here, the court concludes that the Secretary's recognition of the Cherokee leaders elected in the 2003 Elections is a final agency action, because it is a determination of rights and obligations having "legal consequences for those subject to regulation." *See id.* The Cherokee Nation contends, however, that there has not yet been a final agency action because the Secretary is still reviewing the May 24, 2003 amendment of the Cherokee Constitution removing the requirement that amendments be approved by the Secretary. An agency's "failure to act," however, may itself be a final agency action in certain circumstances. *See* 5 U.S.C. § 551(13) (defining "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*" (emphasis added)); *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (observing that "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief . . . the court can undertake review as though the agency had denied the requested relief" (internal quotation marks omitted)). Where an agency action that is required by law is "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the agency's failure to act is, in effect, an affirmative act that triggers final agency action review. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

The Act of 1970 unequivocally requires the Secretary to review and approve the procedures by which a principal chief of the Cherokee Nation is selected. According to the complaint, the Secretary has failed to comply with this duty for more than twenty-five years. *See* Compl., Ex. 10 at 3 (Ltr. from Chief Smith to the BIA, July 14, 2003) ("For over a quarter of a century, the Department has never to our knowledge required nor suggested that Cherokee

members." *Id.*

Nation submit its internal election procedures for Departmental approval."). Moreover, the

Secretary had taken no action on the proposed amendment to the Cherokee Constitution —

submitted in November 2001 — by August 2006, when the Cherokee Nation withdrew its

request for approval. The Secretary's failure to render a decision on the amendment within

almost five years constitutes unreasonable delay, if not a total failure to take action at all. In

these circumstances, the Secretary's failure to act regarding both the election procedures and the

constitutional amendment amounts to a final agency action subject to judicial review. Thus, the

court concludes that the Freedmen may seek review of the Secretary's failure to comply with its

duties under the Act of 1970, as well as its recognition of the results of the 2003 Election.

## C.     Motion to Amend to Add the Cherokee Nation and Officials

In response to the Cherokee Nation's motion to dismiss, the Freedmen seek leave to

amend their complaint to add the Cherokee Nation and its chief and unnamed officials as

defendants. Under the Federal Rules of Civil Procedure, the court may grant leave to amend

"when justice so requires." Fed. R. Civ. P. 15(a). Leave to amend should be freely granted

where "in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated

failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548–49 (D.C.

Cir. 1999). The party opposing amendment bears the burden of demonstrating why leave should

not be granted. *See* 3 Moore's Fed. Prac. § 15.15[2] (3d ed. 2000) (observing that "the party

opposing amendment bears a burden of production to come forward with reasons or evidence to

deny leave to amend"). As already discussed above, the Nation is a necessary party that should

be joined. The Cherokee Nation contends, however, that amendment would be futile because the

Freedmen (1) have failed to exhaust their tribal remedies against the Cherokee Nation and its

officials; and (2) have failed to state a claim within federal jurisdiction against the individual officials.  As explained below, the court rejects these contentions and grants the Freedmen's motion for leave to amend the Freedmen.

### 1.     Exhaustion of Tribal Remedies

The Cherokee Nation contends that the Freedmen are barred from bringing this action against the Nation and its officials because the Freedmen have not exhausted their tribal remedies.  Ordinarily, a federal court may not entertain a civil action within the jurisdiction of tribal forums until the plaintiff has exhausted his or her available remedies in tribal courts.  *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 857 (1985).  Exhaustion of tribal remedies is not required, however, "where the tribal court lacks jurisdiction." *United States v. Yakima Tribal Court*, 806 F.2d 853, 861 (9th Cir. 1986) (concluding that "exhaustion was pointless because tribal court jurisdiction clearly was foreclosed by the sovereign immunity of the United States").

Here, the Freedmen have asserted a cause of action against the Secretary under the APA which is only cognizable in federal courts.  Contrary to the assertions of the Cherokee Nation (and the Secretary), the Nation's tribal courts will not provide a forum for the Freedmen's claims against the Secretary, as the United States is immune from suit in tribal courts.  *Id.*  Thus, the court concludes that exhaustion is not required in these circumstances because the Freedmen's claim against the Secretary cannot be heard in the tribal courts.[13]

---

[13]  The Freedmen also contend that the tribal courts were abolished by the Curtis Act of 1898, and the Cherokee never formally reestablished its courts as required under the Oklahoma Indian Welfare Act, *see* 25 U.S.C. § 503.  The Cherokee still possess "the inherent right to self-government," however, and its existing tribal courts may therefore exercise jurisdiction over tribal law disputes.  *Wheeler v. U.S. Dep't of Interior*, 811 F.2d 549, 550 (10th Cir. 1987)

### 2.   Actions against Individual Officers

The Cherokee Nation also contends that amendment would be futile because Chief Smith and other unnamed tribal officials are covered by the tribe's sovereign immunity and the Freedmen have not stated a claim within the jurisdiction of the federal courts.  As the court has already concluded above, however, tribal immunity does not apply in the face of allegations of violations of the Thirteenth Amendment.  Moreover, even if the tribe were immune, tribal officials are not protected by sovereign immunity when they are acting beyond the scope of their authority, nor are they immune from suits for prospective, injunctive relief.  *See Santa Clara Pueblo*, 436 U.S. at 59 (citing *Ex parte Young*, 209 U.S. 123 (1908)).  When a complaint alleges that the tribal officer has "acted outside the amount of authority that the sovereign is capable of bestowing, an exception to the doctrine of sovereign immunity is invoked."  *Tenneco Oil Co. v. Sac and Fox Tribe of Indians of Okla.*, 725 F.2d 572, 574 (10th Cir. 1984) (permitting plaintiff to seek injunctive and declaratory relief against tribe under exception to sovereign immunity). "Any other rule would mean that a claim of sovereign immunity would protect a sovereign in the exercise of power it does not possess."  *Id.* (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949) ("[T]he conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign.")).  Utilizing such exceptions to sovereign immunity is "especially appropriate" with regard to Indian tribes, who are otherwise protected by an extremely broad immunity that would prevent federal courts from reviewing many aspects of federal law.  *Tenneco Oil*, 725 F.2d at 574 (citing *Santa Clara*).  Thus, the court

---

(holding that Cherokee Nation's tribal courts could resolve election disputes).

concludes that the tribal officials are not immune from suit in these circumstances and may be added to this action.[14]

Additionally, the Cherokee Nation contends that the Freedmen have not stated a claim within the court's jurisdiction against the individual defendants because claims under the ICRA or the Cherokee Constitution are not cognizable in federal court. The court agrees. The only provisions of ICRA that may be enforced in federal court concern the right to habeas corpus. *Santa Clara Pueblo*, 436 U.S. at 71–72 (concluding that ICRA only abrogated tribal immunity for habeas corpus petitions). And a claim that tribal leaders violated the Cherokee Constitution does not "arise under the Constitution, laws, or treaties of the United States," as required by 28 U.S.C. § 1331. *See Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139, 1143 (10th Cir. 2004) (holding that dispute over meaning of tribal law was not properly before federal court). Thus, to the extent that the Freedmen complain of violations of ICRA or the Cherokee Constitution, the court agrees that such claims are not properly before the court. To the extent that such claims arise under the Thirteenth Amendment or the Treaty of 1866, however, such claims are within this court's jurisdiction under § 1331.

As the Cherokee Nation has failed to identify any reasons that would render totally futile the amendment of the Freedmen's complaint to add the Cherokee Nation and its officials, the court concludes that the Freedmen should be allowed to amend their complaint.

_____

[14]   The Cherokee Nation contends that the court must dismiss this suit because the nature and effect of the relief sought are such that the tribe is the real party in interest. *See Fletcher*, 116 F.3d at 1324 ("Because the relief requested by Individual Plaintiffs, concerning rights to vote in future tribal elections and hold tribal office, if granted, would run against the Tribe itself, the Tribe's sovereign immunity protects these defendants in their official capacities."). However, actions for injunctive or prospective relief against an official "are not treated as actions against the [sovereign]." *Hafer v. Melo*, 502 U.S. 21, 27 (1991).

### III.  CONCLUSION

For the foregoing reasons, the court **GRANTS** the Freedmen's motion for leave to file a

second amended complaint [#38], and **DENIES** the Cherokee Nation's motion to dismiss

[#23].[15]

Henry H. Kennedy, Jr.
United States District Judge

Dated: December 19, 2006

---

[15] The Freedmen also filed a "Motion for Leave to File a Surreply" [#32], and a "Motion for Speedy Hearing Pursuant to Fed. R. Civ. P. 57" [#39], each of which the court denies.